COURT OF APPEALS OF VIRGINIA

Present: Chief Judge Fitzpatrick, Judges Elder and Overton
Argued at Richmond, Virginia


TONY CURTIS INGRAM, SR.
                                    MEMORANDUM OPINION[*] BY
v.    Record No. 2720-96-2    CHIEF JUDGE JOHANNA L. FITZPATRICK
                                     MARCH 3, 1998
COMMONWEALTH OF VIRGINIA

            FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
                    John F. Daffron, Jr., Judge

            David B. Hargett (Joseph D. Morrissey;
            Morrissey, Hershner & Jacobs, on brief), for
            appellant.

            Jeffrey S. Shapiro, Assistant Attorney
            General (Richard Cullen, Attorney General;
            Ruth Ann Morken, Assistant Attorney General,
            on brief), for appellee.


     Tony Curtis Ingram, Sr. (appellant) was convicted in a bench

trial of three counts of taking indecent liberties with a minor

while maintaining a custodial or supervisory relationship in

violation of Code § 18.2-370.1.  On appeal, he contends the

evidence was insufficient to prove his guilt beyond a reasonable

doubt.  For the following reasons, we affirm the convictions.

                                    I.

     "On appeal, 'we review the evidence in the light most

favorable to the Commonwealth, granting to it all reasonable

inferences fairly deducible therefrom.'"  Archer v. Commonwealth,

26 Va. App. 1, 11, 492 S.E.2d 826, 831 (1997) (citation omitted).

 "'The judgment of a trial court sitting without a jury is

_____

        [*]Pursuant to Code § 17-116.010 this opinion is not
designated for publication.

entitled to the same weight as a jury verdict and will not be set aside unless it appears from the evidence that the judgment is plainly wrong or without evidence to support it.'"  Id.

Appellant and his wife, Tammy, were experienced foster parents who had cared for between seventeen and twenty foster children prior to August 1991.  In August 1991, pursuant to an emergency removal procedure, a Richmond city social worker removed five siblings – three girls and two boys – from the home of their mother and placed them with Mr. and Mrs. Ingram.  At that time the Ingram household included the Ingrams' son, Tony Jr., and another foster child.  The three sisters were L.P., who was age twelve in 1991 and seventeen at trial, C.T., who was age eleven in 1991 and fifteen at trial, and S.D., who was age four in 1991 and ten at trial.

After some time in the Ingrams' home, the five siblings expressed a desire to be adopted by the Ingrams.  The children had relatives in Philadelphia who opposed the adoption and wanted custody.[1]  The relationship between these relatives and the Ingrams was poor.  For approximately a year, the children's behavior followed a pattern:  first they would appear happy and want the Ingrams to adopt them, then they would speak to their relatives, become upset and rebellious for a few days, and would no longer want the adoption.  In conversation with their relatives, the children also accused the Ingrams of using social

_____
[1]The children's natural mother died in May 1993.

services money intended for the children to buy a new car for themselves. These accusations and the pattern of fluctuating behavior caused the Ingrams to cut off telephone communication between the children and their relatives in Philadelphia. When the problems did not subside, the Ingrams requested that the children be removed from their home, with the understanding that if the children wanted to return, they could. In July 1994, the children were removed from the Ingram home.

Approximately one year after the children left the Ingram home, S.D., the youngest girl, confided to her foster parents' daughter that appellant had touched her sexually. Her sisters also accused appellant of improper sexual conduct, and he was tried on three counts of knowingly taking indecent liberties with a child in his custody.

Testimony at trial established that the three girls shared a room throughout their stay with the Ingrams. They were close to Tammy Ingram and discussed intimate subjects with her on multiple occasions. They had contact with their case worker outside the presence of the Ingrams, and they went to school, socialized, and visited relatives. The girls testified that none of them told of the abuse until more than a year after they had left the Ingram home.

All three girls testified at trial. L.P., the oldest, testified that "everything just started going wrong" in the middle of the first year with the Ingrams; she "was being

3

molested and everything and just not being treated . . . fair between [her] brothers and sisters." She testified that appellant began touching her over and then under her clothes. She claimed he would "caress [her] breast or [her] vagina . . . for . . . punishment." She further testified that appellant "put his finger in [her] vagina," but she could not say whether this happened more than once or when it happened. She added "[w]ell his mouth was on my vagina that once," and claimed that he propositioned her. She stated that these incidents occurred when she was alone with appellant in the basement family room or in her bedroom and that "during the day [she] was punished one time, that's when he came up to [her] room."

L.P. testified that she allowed appellant to do and say these things because she wanted to protect her sisters from him, and she was afraid that the children would be split up if she reported the acts. Additionally, appellant told her that if she spoke of his behavior, he would go to jail and the children would be separated.

C.T. testified that appellant began touching her "after about a year" of residence with the Ingrams. She claimed he grabbed her breasts almost daily when she hugged him before bedtime, even when Tammy Ingram was in the same room with them. In addition, C.T. testified that appellant attempted to place her hand on his penis on four occasions. She did not tell Tammy Ingram, with whom she had a close relationship, because she "was

4

afraid that [Mrs. Ingram] would hate me," and she did not tell the case worker because she did not trust her.

S.D., the youngest, testified that the first time appellant attempted sexual contact with her was when she and appellant were lying under a blanket watching television with the rest of the family. She claimed he attempted to place her hand on his penis, but that she resisted and moved to sit on the floor. S.D. also testified that she was grounded "most of the time" and that appellant would "come up to [her] room and he'd ask [her] to suck his dick." Additionally, she stated that while she was supposed to be grounded and in her room, she was sitting on the stairs and overheard a conversation in the kitchen in which appellant asked L.P. to "suck his dick." S.D. admitted that she did not tell anyone because she sometimes lies, and she was afraid no one would believe her.

Tammy Ingram testified that if the sisters were being sexually mistreated by appellant, she was sure they would have told her. She further testified that, due to the Ingrams' extensive experience with foster children, they had a standing rule that "at no time would either one of us be left alone with one particular child, there would always be somebody else with us, and we were never left alone with one particular child at any time." Additionally, Tammy Ingram testified that, to her knowledge, her husband was never alone with any of the girls during the three years they lived together.

5

Appellant denied each allegation of sexual misconduct. Several additional witnesses who knew appellant and the girls testified to appellant's character and denied knowledge or suspicion of sexual abuse.

The trial court acknowledged that the central issue was one of credibility:

> I listened closely to the testimony. I took notes in the testimony. I am aware of some things that I feel are just simply inconsistencies in the girls' statements, but the bottom line, as I see, is the children, and I'm convinced after hearing the testimony and evaluating this that the Commonwealth has proved its case beyond a reasonable doubt. So accordingly, I . . . find Mr. Ingram guilty as charged in each of the three indictments.

On October 13, 1996, the trial court denied appellant's motion to set aside the verdict.

> I've had the opportunity to go back and read the transcript of the proceedings and read it away from the tension or as lawyers say the heat of trial, and upon review of all the matters, I've concluded that the Commonwealth has proved its case.

The trial court sentenced appellant to five years in prison, four years suspended, for each count, resulting in a sentence of three years of active time in prison.

II.

Appellant challenges the girls' uncorroborated testimony of abuse as vague and inconsistent, and he argues that the alleged events are contrary to human experience and usual behavior to such an extent that the testimony was inherently incredible.

6

"'It is within the province of the fact finder to evaluate the credibility of the witnesses . . . .'" Dicker v. Commonwealth, 22 Va. App. 658, 662, 472 S.E.2d 655, 657 (1996) (citation omitted).

> "In testing the credibility and weight to be ascribed [to] the evidence, we must give trial courts and juries the wide discretion to which a living record, as distinguished from a printed record, logically entitles them. The living record contains many guideposts to the truth which are not in the printed record; not having seen them ourselves, we should give great weight to the conclusions of those who have seen and heard them."

Nicholas v. Commonwealth, 15 Va. App. 188, 194, 422 S.E.2d 790, 794 (1992) (citation omitted). The conclusion of the fact finder "may only be disturbed on appeal if this Court finds that [the supporting] testimony was 'inherently incredible, or so contrary to human experience as to render it unworthy of belief.'" Robertson v. Commonwealth, 12 Va. App. 854, 858, 406 S.E.2d 417, 419 (1991) (citing Fisher v. Commonwealth, 228 Va. 296, 299-300, 321 S.E.2d 202, 204 (1984)). "Under settled principles of law, [a] child's testimony alone, if believed by the [fact finder], [is] sufficient to support appellant's conviction, even in the

absence of corroborating physical or testimonial evidence." Love v. Commonwealth, 18 Va. App. 84, 90, 441 S.E.2d 709, 713 (1994). See Swanson v. Commonwealth, 8 Va. App. 376, 382 S.E.2d 258 (1989) (a ten year old's uncorroborated, impeached testimony that her uncle molested her was sufficient to find guilt).

In the instant case, the victims testified they had suffered abuse from appellant, and appellant denied abusing them. The trial court acknowledged that "the issue here is . . . credibility," and stated that "credibility issues are the hardest issues." After due consideration, the trial court determined that "the Commonwealth . . . proved its case beyond a reasonable doubt."

Appellant also contends the girls' delay of more than a year in reporting the abuse casts doubt on the validity of the claims. "[W]hile the lapse of time between the alleged event and the report is certainly an issue, it is a question of weight rather than of admissibility. '[T]he accompanying circumstances must determine how far the delay has been successfully explained away.'" Lindsey v. Commonwealth, 22 Va. App. 11, 16, 467 S.E.2d 824, 827 (1996) (citation omitted). A delay of several months before reporting abuse may be reasonably "explained by and completely consistent with the all too common circumstances surrounding sexual assault on minors – fear of disbelief by others and threat of further harm from the assailant." Woodard v. Commonwealth, 19 Va. App. 24, 28, 448 S.E.2d 328, 330 (1994).

In the instant case, evidence was presented that appellant threatened one child and that all feared separation if his actions were reported. Credible evidence explained the sisters' delay in reporting the abuse, and we cannot say that the evidence, when viewed in its entirety, was inherently incredible or contrary to human experience. For the foregoing reasons, we affirm the convictions.

<u>Affirmed.</u>